**Electronically Filed
Intermediate Court of Appeals
CAAP-14-0000923
06-MAR-2019
07:57 AM**

NO. CAAP-14-0000923

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


LS, OBO MINOR CHILDREN, Petitioner-Appellee,
v.
SH, Respondent-Appellant

APPEAL FROM THE FAMILY COURT OF THE THIRD CIRCUIT
(FC-DA NO. 14-1-039K)


MEMORANDUM OPINION
(By: Fujise, Presiding Judge, Reifurth and Hiraoka, JJ.)

Respondent-Appellant SH (**Mother**) appeals from the Order for Protection entered by the Family Court of the Third Circuit (**Family Court**)[1] on March 21, 2014, and the Order Denying Respondent's Motion for Reconsideration Filed on March 31, 2014, (**Order Denying Reconsideration**) entered by the Family Court on June 27, 2014. Mother raises three points of error:[2]

    1. the Family Court erred in issuing the Order for Protection;

    2. the Family Court erred in denying Mother's motion for reconsideration; and

    3. the Family Court erred in limiting the time for Mother to examine witnesses during the March 21, 2014 evidentiary hearing.

---

[1] The Honorable Aley K. Auna, Jr. presided.

[2] Mother's opening brief fails to comply with Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b)(4). We have restated the points of error for purposes of clarity.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised, as well as the relevant statutory and case law, we affirm the issuance of the Order for Protection but vacate the Order Denying Reconsideration and remand to the Family Court for an evidentiary hearing on the Motion for Reconsideration.

## I.

Mother and Petitioner-Appellee LS (**Father**) divorced in 2010. In February, 2014, they shared custody of their children LH1 (then age 8) and LH2 (then age 6). On February 6, 2014, Father obtained a Temporary Restraining Order (**TRO**) prohibiting Mother from contacting Father, LH1, or LH2. According to Father's petition, LH1 reported that Mother "choked him against the hall way [sic] wall and threw him to the ground twice" on February 4, 2014. The TRO set a hearing date of February 18, 2014, on an order to show cause (**OSC**) why an order for protection should not be issued against Mother.

On February 14, 2014, Mother filed a motion to modify the TRO and for sanctions against Father. Mother's motion was supported by a letter from LH1's therapist, Nancy M. Sallee (**Sallee**). The Family Court set Mother's motion for hearing on February 24, 2014.

According to the Family Court's minutes, the court referred the case to the State Department of Human Services (**DHS**) on February 6, 2014, but DHS's report had not been submitted by the time the OSC was heard on February 18, 2014. The Family Court continued the OSC hearing from February 18, 2014, to February 24, 2014 (the hearing date for Mother's motion to modify the TRO), and ordered the DHS representative, Denise McAndrews (**McAndrews**), to submit a written report before the hearing.

On February 24, 2014, according to the Family Court's minutes, DHS's counsel appeared and informed the Family Court

2

that McAndrews had been sick for the past week. DHS was unable to locate a report. The Family Court continued both hearings until March 3, 2014.

McAndrews' report was submitted on February 28, 2014. The report stated that DHS's Child Welfare Services section (**CWS**) had received reports concerning abuse of LH1 on separate occasions by Father, Father's wife, and Mother. CWS noted being aware that LH1 "has violent tendencies, formerly [sic] stabbing a teacher with a pencil." CWS's investigation "unconfirmed" the allegations against Father and Father's wife. The investigation concerning allegations against Mother was continuing; the Children's Justice Center (**CJC**) had interviewed LH1 and LH2, Mother had also been interviewed, and CWS had requested police assistance with the case.

On March 3, 2014, Mother filed with the Family Court objections to DHS relying upon the CJC or Hawai'i County Police Department interviews of LH1 and LH2. The objections were supported by a declaration and letter from Sallee (the therapist for LH1 and LH2).

On March 3, 2014, according to the Family Court's minutes, the parties appeared and the court set a contested case hearing for March 21, 2014, and also set prehearing deadlines.

On March 7, 2014, McAndrews filed another report with the Family Court. McAndrews concluded that "mother's actions were appropriate discipline under the circumstances" and reported that CWS was closing its file on the case.

Mother filed her witness list on March 18, 2014. She listed twelve witnesses including herself, Father, McAndrews, Sallee, and Dr. Elodie S. Imonen (a child and adolescent psychiatrist) (**Dr. Imonen**). Father also filed his witness list on March 18, 2014. He listed seven witnesses including Mother and a number of police officers.

The evidentiary hearing took place on March 21, 2014. According to Mother, the Family Court limited each side's examination of witnesses to thirty minutes. Father called five

3

witnesses: himself, his wife, a custodian of medical records, and two police officers. Officer Brett Winther (**Officer Winther**) testified that he interviewed LH1 on February 5, 2014. Father was present during the interview. LH1 "stated something to the effect that his mother choked him." Officer Winther noticed bruising on the side of LH1's face, under his lower jaw area, and on his left forearm. Father's wife authenticated three photographs of LH1 taken on February 6, 2014. Father testified that he picked up LH1 and LH2 on February 5, 2014. LH1 said, "Mom had choked me" and LH2 "confirmed the story." Father saw bruising on LH1's left wrist and cheeks and on the back of LH1's neck. Father took LH1 and LH2 to the police station. The children were interviewed by Officer Winther, separately, with Father present. LH1 told Officer Winther that "he was choked in the hallway, and he had a hard time breathing." LH2 also told Officer Winther that Mother had choked LH1. After the police station, Father took the children to the emergency room. LH1 "told the doctor that his mom had choked him." On cross-examination, Father admitted that LH1 had a history of "Mental deficits, psychological problems." Father admitted receiving reports from LH1's school that LH1 had been aggressive or violent.

Father's Exhibit 4 was LH1's medical records from Kona Community Hospital. According to the records, LH1 was admitted to the emergency room at 10:10 p.m. on February 5, 2014, accompanied by Father. LH1's vital signs were within normal limits. At 10:35 p.m. LH1 told a nurse "that mother 'grabbed arm and drug him' and 'grabbed neck[.]'" He denied any pain. The nurse observed a "[s]mall oval bruise to left wrist[.]" LH1 was seen by a doctor at 12:05 a.m. on February 6, 2014. LH1 stated "that his mother 'choked' him" two days ago. Bruising was observed on the front and back of his neck and on his left forearm. X-rays of his neck were normal. The clinical impression was "possible physical abuse[.]" He was released from

the emergency room in stable condition at 1:23 a.m. on February 6, 2014.

Father presented his case in just over twenty-five minutes and Mother spent four minutes cross-examining Father's witnesses. Mother called four witnesses: herself, her husband, McAndrews, and Dr. Imonen. McAndrews testified that she works for DHS as an assessment worker. She had originally been assigned to investigate a report CWS received in mid-2013 involving alleged sexual abuse of LH1 by Father, and Father's threat of sex abuse to LH2. LH1's 2014 report of being choked by Mother was logged into the case already being handled by McAndrews. McAndrews interviewed LH1 and LH2 at the CJC. LH1 described "his mother restraining him[.]" McAndrews had driven LH1 and LH2 to the CJC for their interviews. "In the back seat of the car, [LH1] was attempting to coach [LH2] on the event that was coming up." This caused her to "have a certain amount of suspicion about the interview that was going to be coming[.]" Mother's Exhibit H was McAndrews' letter dated March 7, 2014, stating that "CWS has concluded its investigation and has unconfirmed [sic] allegations of abuse of [LH1] by his mother[.]" The letter summarized: "DHS believes mother's actions were appropriate discipline under the circumstances." McAndrews testified that based upon her investigation, she concluded that Mother had restrained LH1 to prevent him from harming himself. In response to a question by the Family Court, McAndrews testified that her conclusion was based "in totality, the whole history of the case, everything that I know about the child, his behavior, and the dynamics with the children." On cross-examination, McAndrews was asked about LH1's injuries. She testified that Mother said LH1 had been "acting out" that week.

> Climbing underneath bathroom stalls. The scrape on the back of his neck, it was kind of almost a place where a collar would be. There's like a line there. It did not appear to me to be thumb bruising or those kind of things. It looked like it could have easily been gotten crawling under a bathroom stall, like a child would have to duck their head down and crawl under in a . . . straight line.

5

Mother testified that LH1 had after-school karate class on February 4, 2014. LH1's gi[3] was filthy. Mother found a red mark on LH1's chest and a red mark on his inner-left forearm. Mother also testified that she was a high school special education teacher with training in behavior principles and management, Asperger's syndrome[4] and high-functioning autism, and interventions for oppositional defiant and anger issues. She stated that LH1:

> suffers from autism spectrum disorder, oppositional defiant ADHD, anxiety, and post-traumatic stress disorder. Occasionally he has meltdowns which cause impulsive behaviors, violence, aggression, self-harm, and he can cause -- those types of behaviors can cause harm to himself or those around him.

Mother physically restrains LH1 "if he's causing self-harm or harm on [sic] others." On the evening in question, LH1 became violent because he did not want to take a bath. He swung his fist toward Mother. Mother described what she did to restrain him until "his body relaxed." She then "released him as part of the de-escalation phase." In response to another question by the Family Court, Mother said that she did not inform Father of this because Father "has requested that [she] not speak to him during drop-offs, so there's no communication." On cross-examination, Mother explained that she held LH1's shoulders down with her forearms, cupped her hands behind his head and held his cheek muscles with her thumbs. She does this because LH1 "stimms.[5] He's autistic . . . [Then] he starts stimming in different

---

[3]     A "gi" is a martial arts uniform.

[4]     Asperger's syndrome is one of a group of neurological disorders known as autism spectrum disorders. Asperger's syndrome is considered to be on the mild end of the spectrum. See Asperger's Syndrome, Healthline, https://www.healthline.com/health/ asperger-syndrome (last visited Feb. 2, 2019).

[5]     "Stimming" refers to self-stimulating behaviors, usually involving repetitive movements or sounds, that are part of the diagnostic criteria for autism. See Stimming: Causes and Management, Healthline, https://www.healthline.com/health/autism/stimming (last visited Jan. 30, 2019); DSM-5 Criteria, Autism Speaks, https://www.autismspeaks.org/dsm-5-criteria (last visited Jan. 30, 2019).

limbs." Mother has specific training in this because she is a special-education teacher. Mother was in the process of explaining herself to Father's attorney when Father's attorney exceeded the time allotted to him by the Family Court.

Mother still had nine minutes left so she called her husband (**Husband**) to testify. Husband was home on the evening in question and testified about the events in question. His testimony was consistent with that of Mother. After he heard Mother twice say to LH1, "just because you're autistic, doesn't mean you can act this way[,]" LH1 "calmed down[.]" Father was unable to cross-examine Husband because Father was out of time.

Mother still had two minutes so she called Dr. Imonen (LH1's psychiatrist). Dr. Imonen testified that she had instructed Mother on the need to physically restrain LH1 "in case he was as aggressive at home as he had proven to be at school, that she would likely need to restrain him at home to protect himself or anyone else around."

After hearing closing arguments the Family Court announced its findings and conclusions:

> [We] have statements made by [LH1] to a police officer, to a doctor, to the father, and to the social worker, four different times. Now, if he is lying, that's pretty good, making the same statements four different times to four different individuals. And [LH2] confirming to both the police officer, to the father, to the social worker what he had seen.
>
> Now, I can understand where children will make up stories. Mother believes that he lied. But there are just too many of the same statements made that I cannot discount that.
>
> . . . .
>
> Frankly, I find it hard to believe that social worker would put unconfirmed with all of this information there. That's just beyond me. But she opined what she did. And so with the protective order, I'm just going to say that the prior custody will continue. The prior exchange of visitations will continue.
>
> And the Court will order [Mother] not to use the constraints that she's been invited to do, but she's got to -- she's an expert in the area. She knows how to deal with children. But there's got to be another way to take care of that.

. . . .

> [J]oint legal and physical custody . . . [is] going to
> continue.  It's just that [Mother], you do not lift a hand
> on your child.  There's got to be an alternative way.

The Family Court apparently recognized the difficulty of the situation; after Mother indicated that she did not understand the court's ruling, Mother's counsel asked:

> She's not to threaten or use physical force.  Does that mean she's supposed to ignore the instructions of the psychiatrist?
>
> THE COURT:  I didn't say that.  I said she's not to threaten, physically abuse, or psychologically abuse.  Okay?
>
> [MOTHER'S COUNSEL]:  With the caveat that she is allowed to use such physical restraint as necessary?
>
> THE COURT:  Well, if the doctor's telling her that's what she should do, then I suppose she ought to follow the -- but she's got to be very cautious that it doesn't rise to what I call physical abuse.  Okay?

The Order for Protection was filed on March 21, 2014. On March 31, 2014, Mother filed her Motion for Reconsideration. The motion was supported by Mother's affidavit.  The affidavit stated that the day after the Family Court hearing, LH1 was extremely affectionate to Mother.[6]  When Mother asked why, LH1 "broke down and confessed that he had lied about the 'choking' event[.]"  Mother called the police to report that LH1 had recanted.  A police officer went to Mother's home and interviewed LH1 and LH2 outside of Mother's presence.  The officer informed Mother that LH1 said he had lied about being choked, and that he got his injuries from a bathroom incident at karate practice and at school climbing on the monkey bars.  The Motion for Reconsideration was also supported by a declaration of Sallee (LH1's therapist) that authenticated two letter reports she had written to the Family Court.  The letter dated March 26, 2014, states that during a therapy session that day (five days after

---

[6]     The Family Court allowed Mother to take custody of LH1 and LH2 after the evidentiary hearing because she had no contact with the children for the previous forty-four days.

the evidentiary hearing), LH1 told Sallee "he had been in trouble at school, in A+ and in his karate class." He told Sallee that Mother did not choke him on February 4, "she held his face in her hands to help him quiet down when he was upset." The letter reports that during LH2's therapy session that day, LH2 confirmed that both of them had lied about Mother choking LH1, and that LH1 "was climbing around in the bathroom stall during karate and . . . got into trouble for it."

Father's memorandum in opposition to the Motion for Reconsideration was filed on April 8, 2014. Father argued that there had already been "an extensive evidentiary hearing whereby the parties had a full and complete opportunity to present witnesses and evidence[,]" and that reconsideration was not appropriate because Mother was re-litigating an old matter "that 'could or should' have been raised at the original hearing."

Mother's reply memorandum was filed on April 14, 2014. It argued that the evidentiary hearing was not extensive and Mother was not afforded a full and complete opportunity to present witnesses or evidence because the Family Court restricted each party to thirty minutes. Due to the time limitation she was not able to call a number of witnesses, including Dr. Sylvia Ross (a neuropsychologist who had evaluated LH1) (**Dr. Ross**), Sallee (LH1's therapist), the principal and student services coordinator of LH1's school, and LH1's karate instructor.[7] It also argued that LH1's and LH2's recantations were new evidence because the children had not admitted lying until after the evidentiary hearing.

By order entered on June 27, 2014, the Family Court denied Mother's Motion for Reconsideration. This appeal followed.

---

[7] The principal, student services coordinator, and karate instructor were in fact identified on Mother's witness list. Dr. Ross was not.

II.

A.  **The Family Court Did Not Clearly Err
    in Entering the Order for Protection**

A trial court's label of a finding of fact or a conclusion of law is not determinative of the standard of review. Crosby v. Dep't of Budget & Fin., 76 Hawaiʻi 332, 340, 876 P.2d 1300, 1308 (1994). We review findings of fact under the "clearly erroneous" standard. A finding of fact is clearly erroneous when the record lacks substantial evidence to support the finding or when, despite some evidence to support the finding, we are left with the definite and firm conviction in reviewing all of the evidence that a mistake has been committed. Birano v. State, 143 Hawaiʻi 163, 181, 426 P.3d 387, 405 (2018) (citations and quotation marks omitted). "Substantial evidence" is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." In re Grievance Arbitration Between State of Haw. Org. of Police Officers, 135 Hawaiʻi 456, 462, 353 P.3d 998, 1004 (2015) (citation and internal quotation marks omitted). We review conclusions of law under the "right/wrong" standard. Estate of Klink ex rel. Klink v. State, 113 Hawaiʻi 332, 351, 152 P.3d 504, 523 (2007). A conclusion of law that is supported by the trial court's findings of fact and reflects an application of the correct rule of law will not be overturned. Id. When a conclusion of law presents mixed questions of fact and law, we review it under the "clearly erroneous" standard because the court's conclusions are dependent on the facts and circumstances of each individual case. Id.

The testimony presented during the Family Court's evidentiary hearing was conflicting. The Family Court announced its findings and conclusions after it weighed the credibility of the witnesses and all of the evidence. Assessing the credibility of witnesses is the province of the trial court. Fisher v. Fisher, 111 Hawaiʻi 41, 46, 137 P.3d 355, 360 (2006) ("It is

10

well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of evidence; this is the province of the trier of fact.") (citation omitted). Although the Family Court discredited Mother's testimony and McAndrews' specific findings, the court's findings of fact were supported by substantial evidence, and the court applied the correct rule of law to the facts it found. The Family Court's issuance of the Order for Protection is affirmed.

**B. The Family Court Abused its Discretion in Denying Mother's Motion for Reconsideration**

> The purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented during the earlier adjudicated motion. Reconsideration is not a device to relitigate old matters or to raise arguments or evidence that could and should have been brought during the earlier proceeding. We review a trial court's ruling on a motion for reconsideration under the abuse of discretion standard. An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

Tagupa v. Tagupa, 108 Hawai'i 459, 465, 121 P.3d 924, 930 (App. 2005) (underscoring added) (internal quotation marks, citations, ellipsis, and brackets omitted).

Mother's Motion for Reconsideration presented evidence that did not exist at the time of the Family Court evidentiary hearing – LH1's and LH2's admissions of lying and recantations of the "choking" allegations. The admissions and recantations were made not only to Mother, but to a police office and to the children's therapist, Sallee. The Family Court imposed tight time restrictions during the original evidentiary hearing. It did not receive testimony from LH1 or LH2; its decision was based upon Father's and Officer Winther's testimony about what LH1 and LH2 said, and upon the emergency room notes of the history related by LH1. Because of the time restrictions, the Family Court did not receive evidence from Sallee, from the principal and student services coordinator of LH1's school, or from LH1's

11

karate instructor, each of whom could have corroborated what LH1 and LH2 later told Sallee: that LH1 "had been in trouble at school, in A+ and in his karate class," and "was climbing around in the bathroom stall during karate and . . . got into trouble for it."  Under these circumstances, we hold that the Family Court abused its discretion when it denied the Motion for Reconsideration.  Cf. Doe v. Doe, 98 Hawai'i 144, 155, 44 P.3d 1085, 1096 (2002) (where family court limited child custody evidentiary hearing to three hours, denial of motion for new trial "resulted in the exclusion of testimony of witnesses bearing upon the issue of family violence" was abuse of discretion).  We vacate the Order Denying Reconsideration and remand to the Family Court for an evidentiary hearing on the Motion for Reconsideration.

> **C.    Mother Waived Her Objection to
> the Time Limit Placed by the Family
> Court on the Evidentiary Hearing**

Mother's third point of error is that the Family Court's time limit on the evidentiary hearing deprived her of her right to a fair trial under the Hawai'i Constitution and the United States Constitution.  She did not object or otherwise preserve the alleged error for appeal - for example, by making an offer of proof of what evidence would be adduced if the Family Court allowed her to call additional witnesses.  "In the absence of such an objection at trial there cannot be error, absent plain error."  Doe, 98 Hawai'i at 154, 44 P.3d at 1095.  As to plain error, the Hawai'i Supreme Court has stated:

> The plain error doctrine represents a departure from the
> normal rules of waiver that govern appellate review, and, as
> such, . . . an appellate court should invoke the plain error
> doctrine in civil cases only when justice so requires[.]  As
> such, the appellate court's discretion to address plain
> error is always to be exercised sparingly.

Okada Trucking Co. v. Bd. of Water Supply, 97 Hawai'i 450, 458, 40 P.3d 73, 81 (2002) (brackets, quotation marks, and citations omitted).

Although the family court has "discretion to set reasonable time limits for trial," <u>AC v. AC</u>, 134 Hawai'i 221, 229, 339 P.3d 719, 727 (2014), in cases involving children and allegations of domestic violence especially, the "time limits [must] reflect an informed analysis of the time necessary to afford each party a full and fair opportunity to present their case." <u>Id.</u> at 231, 339 P.3d at 729; <u>see also</u>, <u>Doe</u>, 98 Hawai'i at 156, 44 P.3d at 1097 ("[A]dherence to a time schedule must be tempered by the circumstances of the proceeding as it unfolds, since such circumstances cannot always be accurately predicted ahead of time."). Because we are remanding this case for an evidentiary hearing on Mother's Motion for Reconsideration, we decline to apply the plain error doctrine to Mother's third point of error.

## III.

Based upon the foregoing, we affirm the Family Court's issuance of the Order for Protection but vacate the Order Denying Respondent's Motion for Reconsideration and remand to the Family Court for an evidentiary hearing on Mother's Motion for Reconsideration.

DATED: Honolulu, Hawai'i, March 6, 2019.

On the briefs:

LS,
Petitioner-Appellee, Pro Se.

Gerald W. Scatena,
for Respondent-Appellant.

Presiding Judge

Associate Judge

Associate Judge